**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1967-18T4

L.P.,

    Plaintiff-Respondent,

v.

J.H.,

    Defendant-Appellant.

_____

Submitted April 20, 2020 – Decided June 16, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0136-19.

Gomperts Penza McDermott & Von Ellen, LLC, attorneys for appellant (Joseph M. Freda, III, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

In this post judgment custody dispute, defendant J.H. appeals from the Family Part's November 30, 2018 order denying his motion to change the

residential custody of his son from his former wife, plaintiff L.P., to defendant.[1] Defendant's motion also sought the appointment of a custody expert, the preparation of a custody evaluation, and an in-camera interview of the child. Defendant further sought the suspension of "[p]laintiff's parenting time with [their son] pending a full custody evaluation/risk assessment and well check, and other related relief."

The Family Part judge denied the motion after concluding that defendant failed to make "a prima facie showing that the current custodial arrangement [was] not in the best interest of the child or children in issue." On appeal, defendant contends that the judge "committed harmful error by denying defendant's request for a court-appointed custody evaluation" as had been recommended by the parties' parent coordinator and by not conducting the in-camera interview of the child. We affirm substantially for the reasons expressed by the motion judge.

The facts taken from the motion record are summarized as follows. The parties were married in December 2000. They were divorced on December 3, 2009. They have two children, a daughter born in 2002 and a son in 2007. Prior

---

[1] We refer to the parties by their initials to protect the privacy interests of their children. R. 1:38-3(d).

A-1967-18T4

to their divorce, on July 30, 2009, the parties entered into a consent order that resolved the custody and parenting time issues arising from the divorce. The parties' property settlement agreement, that was made part of their judgment of divorce, incorporated the July 30, 2009 consent order.

The consent order awarded joint legal custody to the parties with plaintiff being designated as the parent of primary residence. It also established a parenting time schedule for defendant. In the order, the parties agreed that if they had any disagreements regarding custody or parenting time, they would consult with Dr. Sharon Ryan Montgomery as a parent coordinator before seeking relief from the court.

In or about 2017, problems between the parties developed. Defendant filed a motion seeking custody of the parties' son after the boy expressed a desire to live with defendant, when plaintiff was relocating to a new town. Prior to oral argument, in an attempt to address those problems, and as contemplated in the 2009 custody and parenting time order, the parties' engaged Dr. Montgomery to address parenting issues despite major hostility between the parties.

In Dr. Montgomery's notes from an October 30, 2017 meeting with the parties, she observed that the parties' son was reported by defendant to have expressed a dislike of plaintiff's fiancé. According to plaintiff, the relationship

was good. The doctor recognized that the daughter had no contact with defendant, but the parties "could not agree on the contributing factors or how it came about." She also noted that the daughter was being treated by Dr. Jessica Auth, her individual therapist at Short Hills Associates in Clinical Psychology, who addressed the strained relationship the daughter had with defendant.

Prior to oral argument, plaintiff relocated with the children and her fiancé to the new town. After oral argument on November 28, 2017, the motion judge denied the relief in a November 29, 2017 order that also directed the parties to cooperate with the recommendations of the professionals providing therapy. Moreover, it stated that the judge would appoint medical professionals to provide reunification therapy for defendant and the parties' daughter and family therapy for the parties and their children. The parties agreed that Dr. Montgomery would recommend therapists.

In December 2017, plaintiff advised Dr. Montgomery that she would no longer participate with defendant and the doctor once her retainer was depleted, as she did not have the funds to pay for further services. On February 13, 2018, defendant wrote to plaintiff asking that they review the original July 2009 custody and parenting time established in the consent order. Plaintiff said she

did not want to have contact with defendant and that he should "stop unnecessarily contacting" her.

Despite plaintiff's initial refusal to speak to him or to continue with Dr. Montgomery, the parties participated in a conference call with the doctor in an attempt to address some issues. According to defendant, plaintiff was not cooperative and conducted the telephone conference in the presence of their son over a telephone speaker.

In May 2018, the son stated he wanted to live with defendant as he had a terrible relationship with plaintiff's fiancé. According to defendant, this "triggered the false allegations [p]laintiff's fiancé[] made about" defendant and their daughter.

In response and after the New Jersey Division of Child Permanency and Placement (Division) became involved with the family, and criminal charges were asserted against each other by defendant and plaintiff's fiancé, plaintiff said she did not want to have contact with defendant and that he should only contact her if there was an emergency regarding their son. As a result, Dr. Montgomery wrote to the parties stating that she could no longer proceed in her

A-1967-18T4

role as parent coordinator and recommended that the children be evaluated by a court appointed or an agreed upon evaluator to assess each parents' concerns.[2]

In his ensuing July 2018 motion, defendant contended in a supporting certification that plaintiff refused to comply with the November 2017 order. He noted that despite that order, plaintiff terminated the daughter's participation in the court ordered therapy, which was contrary to the recommendations of the mental health providers involved, Dr. Auth and another doctor who provided psychiatric treatment and also worked at Short Hills Associates in Clinical Psychology. Defendant also described how matters became worse between him and plaintiff after her fiancé made accusations to the Division that defendant "sexually abused [their] daughter and that [he] attempted to 'run over' [the] fiancé with [his] car." Defendant vehemently denied these allegations.

In a June 26, 2018 letter to defendant, the Division advised that it completed an assessment based upon a report made to the agency on May 21, 2018. The Division also stated it would not be providing services to the family, but it identified certain evaluations that needed to be completed for the children. Specifically, it stated that an evaluation of the daughter's "behavioral health

---

[2] After the motion was filed, Dr. Montgomery indicated that she would be willing to continue in her role as a parent coordinator.

A-1967-18T4

needs" should be performed, a missed mental health provider appointment should be rescheduled, and a well check for both children was needed.

According to defendant, he had conversations with representatives of the Division who stated it was "clear that [the Division] had some significant concerns about [p]laintiff's household, and especially with [p]laintiff's fiancé" that related to his "leering" at their daughter. Moreover, referring to the Division's June 26, 2018 letter, he noted that it was concerned about services not being provided to the children.

Defendant also described an incident on June 29, 2018, two days after he filed his criminal complaint against plaintiff's fiancé, during which a tire on his vehicle was slashed while he was at one of his son's baseball games. He explained that people "witnessed [p]laintiff and her fiancé[] . . . near [his] car." According to defendant, "[t]his [was] not a coincidence."

Defendant contended that plaintiff did "not view [him] as a co-parent," and he described an incident in which he was notified by the school that his son was having certain physical pains and needed to be seen by a doctor. Although defendant left work to immediately go to the school, plaintiff had taken the son to the hospital, but she refused to communicate with defendant as to the child's status. He also described other incidents that were communicated to him by his

son where the plaintiff's fiancé and his mother's conduct apparently disturbed the child. Defendant attributed these various incidents to plaintiff being emboldened by the court's November 2017 order denying his application for relief.

Plaintiff filed a certification in opposition to defendant's motion, denying defendant's allegations. It was plaintiff's contention throughout her opposition that defendant was trying to control their son and alienate him from plaintiff and their daughter. Plaintiff's certification reviewed the entire history of problems that the parties experienced with parenting time and the animosity that existed between the two of them, much of which occurred prior to the court's November 2017 order. She also requested that child support be paid through probation, and she sought the equitable distribution of defendant's pension.

In her certification, plaintiff also confirmed that both children were enrolled in their new schools, experienced success in their studies, and were otherwise thriving in their new environment. She detailed the son's involvement in school, extra-curricular activities, and sports.

Plaintiff also explained that defendant had called the Division on three different occasions, subjecting the children to unnecessary investigations. Plaintiff also made veiled accusations against defendant, stating that he was

8

avoiding having the judge interview their daughter, who was then sixteen years old, "[b]ecause if the [c]ourt hear[d] what [the daughter] ha[d] to say, . . . defendant [would] be recognized for what he ha[d] done to her" and that he "alone is responsible for the demise of his relationship with his daughter." According to plaintiff, defendant "abandoned [their] daughter many years ago." She also explained that contrary to defendant's contentions, their daughter was and has always been involved with "a child advocacy center," which "has performed a risk assessment," and there was no need for a full custody evaluation which the court had rejected in the November 2017 order as well.

Plaintiff also explained in detail problems with defendant's participation in reunification therapy and with effectuating parenting time. Plaintiff stated that defendant used the parent coordinator "to try and control [her] parenting time with both of [their] children and [he was] very intent on splitting up [the children], even carelessly."

Referring to the call to the Division asserting allegations against defendant, plaintiff stated that they were referred to the children's advocacy center after a "disturbing call was made to [the Division] by a third party regarding . . . [d]efendant's behavior. [Plaintiff did] not wish to share this

information, as [she] truly fear[ed] the repercussions that [would] happen if . . . [d]efendant . . . [saw] the phone call and what initiated same . . . ."

Defendant then filed a reply certification reasserting his original contentions and challenging the statements made by plaintiff. He also addressed issues mentioned by plaintiff, such as child support and the distribution of his pension.

After considering the parties written submissions, the Family Part judge entertained oral argument on November 30, 2018, before placing his decision on the record. At the outset, he stated that "the legal standard for custody determinations is whether there [was] a prima facie showing that the current custodial arrangement [was] not in the best interest[s] of the child or children in issue, and [that he had] concluded after carefully reading all the papers . . . that . . . defendant" did not make "out a prima facie showing."

The judge found that despite the parties' animosity, the current arrangement seemed "to be going well." He observed that there was no evidence that their son had any trouble in school, that he had difficulties making friends, or engaging in activities as a result of the plaintiff's move to her new home since the time he addressed the issue of relocation in the November 2017 order. The judge acknowledged that defendant wanted to spend more time with his son but

"that [was] not a basis for concluding that [the son's] best interests [were] not being served by the current custodial arrangement."

Addressing Dr. Montgomery's suggestion for an evaluation, the judge stated, he "just [did not] think subjecting either child to further evaluations and poking and prodding by experts [was] warranted at [the] time, absent that sort of prima facie showing." He noted that the mere fact that the son indicated to one parent that he wanted to live with defendant was not sufficient evidence. He concluded that "[t]here [was] really just nothing in this record indicating that [the son was] at risk, that he's having troubles of any kind, it's just not there." For that reason, the judge found there was no purpose in "ramp[ing] up" the matter.

Addressing defendant's relationship with his daughter, the judge observed that if defendant pursued some type of reunification therapy with his daughter in his motion, the judge would have had "no problem" with that request had it been made. Turning to the Division's recommendation that he review its records, the judge stated that he did not perceive any need to see those documents. According to the judge, "[i]f there were things happening since [plaintiff's relocation] . . . that cause[d him] concern, . . . then [he] would have [had] a basis to look at" those records. Moreover, in light of the fact that, as

defendant's counsel confirmed, the Division did not have "any concerns for the safety of either child" under the present custodial arrangement, there was no need to take any action.

The judge concluded that there was "not enough showing for [him] to warrant" reviewing the statutory factors in making a custody determination as argued by defendant. Further, there was no need to interview the parties' son. In closing, the judge noted that while there was a high degree of conflict between the parties that was separate and apart from the children thriving under the current custodial arrangement, albeit their being subjected to the negative impact of their parents' issues. This appeal followed.

Our review of a Family Part judge's determination in custody and parenting time matters is limited. "Family Part judges are frequently called upon to make difficult and sensitive decisions regarding the safety and well-being of children." Hand v. Hand, 391 N.J. Super 102, 111 (App. Div. 2007). "[B]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Our narrow review is based upon the fact "we have 'invest[ed] the family court with broad discretion because of its specialized

knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017) (alteration in original) (quoting N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 427 (2012)).

"[W]e defer to [F]amily [P]art judges 'unless they are so wide of the mark that our intervention is required to avert an injustice.'" Ibid. (quoting F.M., 211 N.J. at 427). However, "[w]e owe no special deference to the . . . judge's legal determinations." Slawinski v. Nicholas, 448 N.J. Super. 25, 32 (App. Div. 2016). "Notwithstanding our general deference to Family Part decisions, we are compelled to reverse when the [judge] does not apply the governing legal standards." Ibid. (citation omitted).

"In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand, 391 N.J. Super. at 105 (citing Kinsella v. Kinsella, 150 N.J. 276, 317 (1997)). In making the determination, a judge "must focus on the 'safety, happiness, physical, mental and moral welfare' of the children." Ibid. (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)). "In issues of custody and visitation, '[t]he question is always what is in the best interests of the children, no matter what the parties have agreed to.'" Ibid.

(alteration in original) (quoting P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999)).

"A party seeking to modify custody must demonstrate changed circumstances that affect the welfare of the children." Ibid. (citing Borys v. Borys, 76 N.J. 103, 115-16 (1978)). Custody orders are subject to revision based on the changed circumstances standard. Eaton v. Grau, 368 N.J. Super. 215, 222 (App. Div. 2004).

"Modification of an existing child custody order is a 'two-step process.'" Costa v. Costa, 440 N.J. Super. 1, 4 (App. Div. 2015) (quoting R.K. v. F.K., 437 N.J. Super. 58, 62 (App. Div. 2014)). "[A] motion for a change in custody . . . will be governed initially by a changed circumstances inquiry and ultimately by a simple best interests analysis," R.K., 437 N.J. at 62 (second alteration in original) (quoting Baures v. Lewis, 167 N.J. 91, 116 (2001), overruled on other grounds, Bisbing v. Bisbing, 230 N.J. 309 (2017)), using "the same standard that applie[d] at the time of [an] original judgment of divorce." Ibid. (second alteration in original) (quoting Gonzalez-Posse v. Ricciardulli, 410 N.J. Super 340, 350 (App. Div. 2009)).

"First, a party must show 'a change of circumstances warranting modification' of the custodial arrangements." Costa, 440 N.J. Super. at 4

(quoting <u>R.K.</u>, 437 N.J. Super. at 63). Only if the party makes that showing is that party then "entitled to a plenary hearing as to disputed material facts regarding the child's best interests, and whether those best interests are served by modification of the existing custody order." <u>Ibid.</u> (quoting <u>R.K.</u>, 437 N.J. Super. at 62-63). A Family Part judge's determination regarding a change of circumstances is subject to our review for an abuse of discretion. <u>Ibid.</u>

Applying these guiding principles, we conclude that the Family Part judge here properly exercised his discretion when he found that defendant failed to establish a change of circumstances. There was no evidence presented that the parties' son's best interests were not being served by the current custodial arrangement, although the record was replete with proof that the parties continue to maintain a heightened state of animosity towards each other. As to the son, however, he was thriving in school and there was no evidence that he suffered either psychologically or physically or that he was not enjoying life to its fullest.

Defendant's reliance upon suggestions made by the parenting coordinator for an evaluation or by the Division suggesting that its records be reviewed were insufficient to establish a change of circumstances under the appropriate standard. The evidence here established that the parties' daughter, and not the

son, suffers from significant issues that were not addressed by defendant in his motion.

Without meeting the required threshold, the judge properly refused to order a custody investigation and hearing on the issue.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1967-18T4